UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UGS Corporation, | : | Case No. 1:06-cv-084 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| Satyadev Musti, | : | |
| | : | |
| Defendant. | : | |

**ORDER**

Before the Court are the parties' cross motions for summary judgment.  Plaintiff UGS Corporation seeks a partial summary judgment of liability against Defendant Musti, based on Musti's alleged breach of certain non-competition and non-solicitation agreements with UGS, Musti's former employer.  (Doc. 70)  Musti seeks summary judgment on all claims against him, contending he has not breached the terms of any applicable agreement.  (Doc. 68) Musti also seeks judgment on his counterclaim for commissions and stock options, which he contends UGS has wrongfully refused to pay him.  Both parties have filed responses and replies to each other's motions.

**FACTUAL BACKGROUND**

1.  <u>Musti's Employment with UGS</u>.

Musti began working for Structural Dynamics Research Corporation on June 1, 1987, following his graduation from Arizona State University.  This was Musti's first job.  SDRC

-1-

later paid for Musti to obtain an MBA from the University of
Cincinnati.  SDRC also sponsored Musti's immigration to the
United States.

SDRC was acquired by Electronic Data Systems (EDS) in 2001.
EDS merged SDRC with Unigraphics, another company EDS acquired,
and the merged company became known as EDS PLM Solutions.  This
merged company was then bought from EDS by a private equity
group, and became the current UGS Corporation, headquartered in
Plano, Texas.  Musti was continuously employed by these entities
from June 1, 1987 through January 2006 (excepting only a brief
period in 1998).

UGS develops and sells engineering software generally known
as Product Lifecycle Management, or PLM.  According to UGS, these
products include engineering and manufacturing software (CAD, CAM
and CAE), and product data management software (PDM).  According
to Keith Charron (UGS Vice President and General Manager for
Global Sales), UGS has three fundamental businesses: mechanical
design (NX), product data management (PDM), and digital
manufacturing.  Despite the different products and business
categories, UGS describes its overall sales efforts as
collaborative, intended to encourage cross-selling of all UGS
product lines.  UGS has annual global sales meetings for all
sales employees and selected customers, concerning overall sales
strategy and product lines.  All UGS sales employees have access

-2-

to the UGS intranet, which contains information about UGS customers, product characteristics and development, and company marketing activities.

Musti's positions changed over time. Musti joined a UGS division called Industry Solutions in 1999. This group concentrated on PDM software sales to the consumer packaged goods and retail apparel industries. Musti became the sales manager for Industry Solutions at the end of 2003, after several years of experience with UGS' product data management software ("Metaphase" and "Teamcenter Enterprise"). Musti reported to Jim Menego, his direct supervisor.

2. <u>Musti's Separation from UGS</u>. A company named MSC approached Musti in late 2005, asking him to leave UGS and offering him a substantial increase in pay and other benefits. Other SDRC/UGS employees had left UGS to join MSC, including Jim Howaniec, whom Musti describes as the former head of the UGS consumer products group sales team.

In mid January 2006, Musti was questioned by Keith Charron about whether MSC was recruiting Musti. Musti testified that he was upset that those conversations had been discovered, but he disclosed the details of MSC's offer to Charron. A few days later, Jim Menego (with approval of UGS management) told Musti he had to leave the building; Menego took Musti's computer, key card and telephone. (Menego's email of January 12, 2006, Charron

-3-

Exhibit 2, summarizes the chain of events over several days during the week of January 9, 2006.)  Part of UGS' response was a January 12, 2006 letter from UGS' general counsel to Musti (Doc. 68, Exhibit C), stating that Musti's departure to MSC would violate Musti's non-compete and non-solicitation agreements.

Musti decided to leave UGS on Sunday morning, January 15, 2006, and called Menego to tell him of his decision.  Musti then went to his UGS office to clean out his things.  Musti testified that Jim Menego was with him the entire time Musti was on UGS premises.  Musti asked Menego what he should do with his old notebooks, and Musti took the notebooks to his car with Menego's knowledge and consent.  (Menego even helped Musti push them to Musti's car on a cart.)

Musti was hired as Vice President, Enterprise Clients, at MSC.

Before Musti's departure, other UGS sales employees had left UGS for jobs at MSC.  One salesman on the Industry Solutions team moved to MSC in mid-2005.  He gave notice but continued to work at UGS and retained access to his computer during his transition. Another salesman in the same group gave notice of his departure, and was permitted to complete a UGS project.  Two more UGS salesmen also left for MSC, but none of these individuals faced legal action from UGS based on their departure for MSC.  Musti's second declaration states that 20 former SDRC employees work for

-4-

MSC, and that many others work at a variety of other software companies.

UGS did take notice of the number of its employees leaving for MSC.  Keith Charron described it as "MSC is clearly on a hiring spree they clearly have targeted SDRC guys and they probably are targeting the veterans within those ranks." (Charron Depo p. 91.)  There is also a suggestion of friction between executives at UGS and MSC, based on prior relationships formed when EDS bought SDRC and UGS, and merged them into one division.

3.  <u>The Agreements At Issue</u>.  UGS alleges that Musti has breached three separate agreements he signed during his tenure with UGS and the prior entities.  The agreements are attached to UGS' Second Amended Complaint (Doc. 66).

A.  <u>The September 6, 2004 Employment Agreement</u>.  Musti and UGS executed this Agreement in consideration of Musti's ongoing employment and his participation in a management incentive plan.  Musti agreed that he would never use or disclose any UGS confidential information, which is defined to include the identity of UGS customers, customer lists and sales records, the identity of contacts at UGS purchasers, and people and organizations with whom UGS has a business relationship.  (¶2a) Musti also agreed  that all documents relating to UGS belonged to the company, and that he would not remove or copy them.  (¶2b)

-5-

Musti agreed that for a 12-month period after leaving UGS, he would not compete with UGS by working for any of several specifically named competitors.  MSC is not listed as a forbidden competitor.  (¶4)   Musti also promised that, for 24 months following his termination, he would not solicit any UGS employees or customers, nor seek to persuade any UGS customer to conduct with any other company the business "which such customer conducts or could conduct with [UGS]."  (¶5a)

The Agreement's merger clause states that the Agreement is in addition to, and does not terminate or supersede, any additional obligations Musti may have under any prior employment or non-disclosure agreements, or under applicable law.  In the event of a conflict, the 2004 Agreement governs.  (¶8)

   B.  <u>The May 2, 2003 Equity Related Agreement</u>.  This Agreement between Musti and EDS also contains non-disclosure and non-competition covenants.  "Confidential Information" is broadly defined, and includes client lists and specifications, pricing and cost information.  (¶1b)  "Competitor" is defined as any entity engaged in EDS' business, which is broadly defined as providing information technology and related services such as process management, information processing and solutions, management and electronic business consulting.  (¶1c)  Musti agreed never to use EDS' confidential information. (¶2)  He also agreed not to directly compete with EDS for six months after his

-6-

termination; this covenant, however, is limited to the geographic region where Musti worked for the six months preceding his termination. (¶3a)  Musti also agreed not to work for any current or prospective EDS client, with whom Musti interacted prior to his termination, for twelve months after his termination.  (¶3b) He also promised not to induce, encourage or solicit other EDS employees or clients to leave EDS for twelve months following Musti's termination.  (¶¶3c and 4)

This Agreement's merger clause unambiguously provides that the Agreement supersedes all prior agreements between the parties (with exceptions not applicable to this dispute).  (¶ 14)

C.  <u>The November 27, 2001 Non-Compete Agreement</u>.  This Agreement between Musti and UGS is described as a supplement to a "Proprietary Rights and Confidentiality Agreement," a document that is not in the record.  The non-compete agreement generally prohibited Musti from competing, or working for any customer with whom Musti had substantial contact while at UGS, for twelve months after his termination.  It also barred solicitation of UGS employees and customers for the same time period.

As a preliminary matter, the Court finds the 2001 Non-Compete Agreement is irrelevant to this case.  The 2003 Agreement expressly states that it supersedes "all" prior agreements on the topics covered, thus the 2003 Agreement extinguished the 2001 Agreement.  UGS argues that the 2004 Agreement's merger clause

-7-

somehow "revived" the defunct 2001 Agreement. The Court disagrees. The 2004 merger clause clearly states that it does not terminate additional obligations Musti "may **have**" under prior agreements. The use of the present tense clearly describes then-existing obligations, and does not revive any obligations under agreements which were no longer valid when Musti signed the 2004 Agreement.

    4. <u>The Claims At Issue.</u>

UGS' Second Amended Complaint alleges breach of Musti's employment contracts; tortious interference with UGS customer and employee contracts; tortious interference with prospective economic relationships between UGS and its customers; and theft and/or misappropriation of trade secrets under Ohio statutory and common law. The complaint seeks preliminary and permanent injunctive relief, disgorgment of all income Musti has received in violation of his agreements, punitive damages, costs and attorneys fees.

UGS did not seek a preliminary injunction, and its current motion seeks a judgment on liability only, reserving the question of appropriate injunctive relief for trial.

Musti's amended counterclaim (Doc. 45) seeks a judgment for unpaid compensation Musti alleges he was owed at the time he left UGS.

**ANALYSIS**

1.   <u>Summary Judgment Standards</u>.

The standards for summary judgment are well established.
Summary judgment is proper "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party
opposing a properly supported summary judgment motion "'may not
rest upon the mere allegations or denials of his pleading, but
... must set forth specific facts showing that there is a genuine
issue for trial.'"  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities
Serv. Co.</u>, 391 U.S. 253 (1968)).  The Court is not duty bound to
search the entire record in an effort to establish a lack of
material facts.  <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d
399, 404 (6th Cir. 1992); <u>InterRoyal Corp. v. Sponseller</u>, 889
F.2d 108, 111 (6th Cir. 1989), <u>cert. den.</u>, <u>Superior Roll Forming
Co. v. InterRoyal Corp.</u>, 494 U.S. 1091 (1990).  Rather, the
burden is on the non-moving party to "present affirmative
evidence to defeat a properly supported motion for summary
judgment...," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-
80 (6th Cir. 1989), and to designate specific facts in dispute.
<u>Anderson</u>, 477 U.S. at 250.  The non-moving party "must do more

-9-

than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id</u>. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir. 1979), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"

-10-

_Celotex Corp. v. Catrett_, 477 U.S. 317, 327 (1986) (citations omitted).

2.   _Covenants Not To Compete._

Ohio law, which applies to this diversity action,

> . . . has long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions. _Briggs v. Butler_ (1942), 140 Ohio St. 499, 507, 24 O.O. 523, 45 N.E.2d 757. Such an agreement does not violate public policy, 'being reasonably necessary for the protection of the employer's business, and not unreasonably restrictive upon the rights of the employee.' _Id._ at 508, 24 O.O. 523, 45 N.E.2d 757.

_Lake Land Emp. Group v. Columber_, 101 Ohio St.3d 242, 244 (Ohio 2004). Non-competition agreements will be enforced only to the extent that they are reasonable. In _Raimonde v. Van Vlerah_, 42 Ohio St.2d 21, 25-27 (1975), the Ohio Supreme Court set forth factors used to determine the reasonableness of covenants not to compete. These factors include:

> . . . time and space limitations, whether the employee is the sole contact with the customer, whether the employee has confidential information and trade secrets, whether the agreement seeks to limit only unfair competition or is designed more broadly to eliminate ordinary competition, whether the agreement seeks to stifle the employee's inherent skill and experience, whether the benefit to the employer is disproportional to the detriment to the employee, whether the agreement bars the employee's sole means of support, whether the skills that the agreement seeks to restrain were actually developed during the

-11-

> employment, and whether the forbidden
> employment is merely incidental to the main
> employment.

To enforce its covenant and enjoin Musti's employment with MSC, UGS must show by clear and convincing evidence that such injunctive relief is reasonable under all the circumstances.  Id. As noted above, however, UGS is not seeking an injunction at this time.

UGS makes several arguments to support its request for entry of a judgment of liability against Musti.  UGS contends that Musti will "inevitably disclose" UGS trade secrets and confidential information while employed at MSC, and so he has or will violate his UGS Agreements and Ohio's trade secrets statute. UGS also argues that Musti breached the Agreements' confidentiality clauses when he removed his UGS notebooks when he departed from UGS.  And UGS contends that Musti breached his non-compete covenants by accepting employment with MSC in direct competition with UGS.

Musti argues that he has not violated any of the agreements at issue.  He also argues that enforcement of the restrictive covenants to prohibit his employment would be unreasonable under the Raimonde factors.  And, Musti contends that there is no evidence that he has misappropriated any UGS confidential information or trade secrets.

3.  <u>Inevitable Disclosure</u>.

UGS contends that Musti's high level sales position (and the
fact that he was apparently an excellent and valued employee)
exposed him to the strengths and weaknesses of UGS products, as
well as its detailed marketing plans and product development
information.  UGS notes that even the most well intentioned ex-
employee cannot "wall off" this sort of confidential information,
when that employee voluntarily puts himself in direct competition
with his former employer.  As UGS describes it, Musti was in
charge of selling UGS software, and is now in charge of selling
MSC software, so it is inevitable that UGS confidential
information will come into play in his new job.

Musti argues that his work for MSC does not involve the same
or similar products that he sold for UGS.  He compares his move
to MSC to that of a "Tide" detergent salesman who moves to a
conglomerate competitor and sells potato chips.  No confidential
or proprietary information Musti may have obtained as the Tide
salesman (his UGS work selling PDM software to consumer products
industries over the last three years) would be used in his new
job selling potato chips for MSC (which Musti describes as
selling MSC's simulation software, a product that UGS does not
make or sell).  Musti also questions whether MSC is a "direct
competitor" of UGS, noting that UGS identifies MSC as a "gold
level" collaborator with UGS on its website.

-13-

The "inevitable disclosure" doctrine frequently arises in actions seeking enforcement of restrictive covenants.  See, e.g., P&G v. Stoneham, 140 Ohio App.3d 260 (1st App. Dist. Ohio 2000), an appeal from the trial court's denial of P&G's request for injunctive relief against its former senior level manager. Stoneham, in charge of international marketing for P&G hair care products, left P&G to be President of Alberto-Culver International; Alberto-Culver made VO5, the most popular competitive product to P&G's brand.  Stoneham was described by the court:

> As a member of worldwide multi-functional teams at P&G, Stoneham developed a confidential ten-year marketing plan for one of P&G's hair-conditioning products, participated in the development of new products, and helped develop a ten-year plan for P&G's best-selling brand, Pantene. No one was more knowledgeable about the foreign marketing of P&G's haircare products, and no one was more knowledgeable about P&G's hair-conditioning products, both existing and potential, than Stoneham.

Id. at 266.  P&G presented very detailed and exhaustive evidence of Stoneham's intimate knowledge of P&G's products, and its confidential, specially-designed marketing strategies.  Evidence before the trial court included the fact that, once at Alberto-Culver, Stoneham held back an already-prepared marketing plan for VO5, in order to improve it - no doubt incorporating his knowledge of P&G's own marketing strategies in the relevant market.  Given the detailed evidence adduced, and the direct

-14-

competition between the two companies in the same market, P&G argued that Stoneham was bound to use P&G confidential information in his new job.  The Court of Appeals agreed:

> According to the inevitable-disclosure rule, a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment.

Id. at

Here, Musti argues that the sales "niche" he occupied at UGS is divorced from his new job at MSC.  The market niches occupied by PGM, CAD, CAE and CAM may differ.  But given Musti's long tenure with the company, he undoubtedly is at least familiar with the other UGS products and has undoubtedly heard from his customers about those other products.  There is apparently no dispute that MSC and UGS do compete in the "CAE" area, and there is evidence that Musti is at least familiar with UGS capabilities in that area.

However, to determine if the "inevitable disclosure" doctrine would apply, the Court must determine if Musti actually has confidential information or trade secrets.

UGS does not respond to the fact that its own website describes MSC as a "gold level partner" in software and "GO PLM" applications.  UGS describes its partner program as encouraging

-15-

"strong alliances" with leading software and hardware companies. UGS partners receive certifications in various competency areas depending on their expertise.  Software partners (of which MSC is one) produce software solutions "complimentary to the UGS suite of products."  These partners can deliver unique solutions compatible with UGS products, "or in some cases built using UGS software APIs [application programming interface] or components." A "Foundation" partner (MSC is one) is described as a company who will "implement their solutions with full access to [UGS] APIs and in some cases our development environment."  UGS also provides a link to the MSC website.[1]  If UGS is disclosing information to MSC in the context of its "partner" program about its customers and their needs, this information is obviously not "confidential."

In addition, it is overly simplistic for UGS to argue that Musti sold software for UGS, and is also selling software for MSC.  Menego's testimony is helpful on this question.  When he was asked if he thought Musti capable of working at MSC and not divulging UGS information, he responded: "It's a very complicated question, because they are in the same business that UGS is in in relation to the CAE space, so anything that he - any comment he makes based on his past history or experiences with our products

---

[1] All quotes are from www.ugs.com/partnersbycompetency, last accessed January 30, 2007.

or companies could be - you know, could be based on the information he knows." (Menego Depo pp. 26-27.)

The Court concludes the record to date establishes no more than Mr. Menego describes, a possibility of disclosure of information that may be "confidential" or may be a trade secret. As this is one of many factors to consider in determining the reasonableness of a restrictive covenant, the Court will not grant summary judgment to UGS on this question standing alone.

    4.   <u>Breach of Confidentiality Clause</u>.

UGS argues that Musti violated the confidentiality clause when he took his UGS notebooks with him when he left UGS. UGS argues that the notebooks, which Musti maintained during his tenure with UGS, contain confidential information. The notebooks are voluminous, but the Court has reviewed some excerpts and Musti's testimony. The notebooks apparently record notes of customer meetings, along with other notes of less obvious derivation and include personal information. At least some portion of the notebooks may likely fall within the 2004 Agreement's definition of confidential information, such as identity and needs of the customers, prospective customers of UGS, or people and organizations with whom UGS has business relationships.

However, confidential information is expressly defined as information which has not been made public. Musti notes that the

-17-

UGS website contains detailed descriptions of many UGS customers and contacts, their specific needs, and the projects that UGS has undertaken for those customers.[2]  Obviously, any information in the notebooks that is included in the website, or otherwise made public, is not "confidential information."

The same analysis applies to whether the notebooks are properly classified as trade secrets.  The Ohio statute, R.C. 1333.61(D), defines trade secrets as business information that (1) derives independent economic value from its disclosure and use, **and** (2) is subject to reasonable efforts to maintain its secrecy.

More importantly, Musti's declaration states that he removed the books with Menego's express knowledge and consent.  Musti took the notebooks directly to his vacant former home and stored them in the basement.  He did not look at them, and the books remained in the basement until Musti gave them to his lawyers in this action, at their request.  Musti has no copies of the books, and has offered to return them to UGS.

UGS does not contest Musti's factual recitation of the circumstances surrounding the notebooks.  Nor does UGS offer any evidence that Musti refused to return them after a demand for their return.  UGS cites the Agreement's requirement that any

_____

[2] See www.ugs.com/industrysolutions, last accessed on January 30, 2007.

waiver of the confidentiality agreement must be in writing and signed by an authorized UGS officer.  But the Court does not view Musti's argument as based on waiver; he argues he did not knowingly violate the confidentiality clause given the facts.

The Court concludes that the notebooks are covered by Paragraph 2b of the 2004 Agreement, stating that Musti will not remove Company documents.  But the fact that he removed the notebooks with the express knowledge and consent of his supervisor support the conclusion that he did not "steal" or "misappropriate" the notebooks.  The Court concludes that Musti has not violated Paragraph 2a of the Agreement, governing nondisclosure of confidential information, simply by taking the notebooks and storing them as he has described.

5.  <u>Violation of the Non-Compete Covenants</u>.  The non-competition clauses in the 2003 EDS contract and the 2004 UGS Employment Agreement are different.

The 2003 Agreement, paragraph 3a, contains a six month prohibition on Musti's employment in the same geographic region with a "direct competitor" of EDS, and is limited to the same or similar duties Musti performed for EDS.  Paragraph 3b imposes a 12 month ban on Musti working for an EDS client with whom Musti interacted in the six months preceding his termination.

The 2004 Agreement, ¶4, forbids competition for 12 months instead of six, but also lists the specific UGS competitors for

-19-

whom Musti is prohibited from working.  As noted, MSC is conspicuously absent from that list, and Musti has not violated this section of the 2004 Agreement.

Musti argues that the 2003 agreement lapsed when EDS sold off its UGS/SDRC subsidiary to a separate entity.  The "new" UGS, says Musti, is not a "successor" to EDS (which still exists as a publicly traded corporation), nor its "assignee" under Ohio law.

Neither party provides any substantive information about the sale that created the current UGS, or whether the non-compete Agreements were legally assigned as part of that sale.  As a general matter, a successor is "another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of the first corporation." Village/Chagrin Partners v. Board of Education, 2003 Ohio 7075 (8th Dist. App. Ohio 2003).  The Court assumes for purposes of the pending motions that UGS is a "successor" to EDS and succeeded to all of the benefits and burdens of the 2003 Agreement.  (Some doubt exists on this question, especially because UGS did not include the 2003 EDS Agreement in its original complaint and according to Musti, only discovered it when Musti produced it during discovery.)  The substantive question for the motions is whether the 2003 Agreement imposes any "additional obligations" upon Musti that survive under the 2004 Agreement's merger clause.

-20-

The Court concludes that the 2003 Agreement's non-compete clause does not impose "additional" obligations on Musti, that is, obligations that are greater than or substantively different from those contained in the 2004 Agreement.  The 2004 Agreement's period of restraint is twice as long as that of the 2003 Agreement.  More importantly, UGS took the opportunity in its 2004 Agreement to specifically identify the "direct competitors" for whom Musti would be forbidden from working.  One factor in the Raimonde test of reasonableness of a covenant is whether the benefit to the employer is disproportional to the detriment to the employee.  The Court concludes that, given UGS' unambiguous identification of those competitors that UGS believed its employees should not work for, the benefit to UGS of enforcing the 2003 covenant is clearly disproportional to the burden on an employee like Musti, who states he relied on the identification in his current Agreement.

Therefore the Court concludes that Musti has not violated the terms of his non-compete covenant.

6.  Non-Solicitation Clauses.

Paragraph 4 of the 2003 EDS Agreement imposes a 12 month ban on soliciting current or prospective EDS clients, with whom Musti had personal involvement in the six months preceding his termination.  In Paragraph 5a of the 2004 UGS Agreement, Musti agrees that for two years he will not solicit or encourage any

-21-

UGS customer "to terminate or diminish its relationship with the Company and I will not seek to persuade any such customer to conduct with any individual or entity any business or activity which such customer conducts or could conduct with the Company." As with the non-compete clauses, the Court concludes that the 2003 Agreement does not impose "additional obligations" on Musti, and will consider only the 2004 Agreement.

UGS argues that Musti has admitted his breach of the non-solicitation covenants. UGS cites Musti's testimony that he has solicited sales from companies that are UGS customers, and informed some of his contacts that he has moved to MSC. Musti admitted that a particular individual at one company he contacted is someone he knows from his time at SDRC. Musti's notes state with regard to this company that "UGS [was] not even in the hunt," which UGS characterizes as an admission that UGS competes with MSC. Several MSC e-mails listing Musti as a recipient mention these companies and contacts in those companies. Another e-mail is an MSC "target list" of companies, all of whom are UGS customers that Musti solicited while at UGS.

Musti responds that at least one company contact is someone he knew when he was a young employee at SDRC, and that in any event, MSC had an established relationship with that company that predated SDRC's relationship. And Musti again argues that he is not selling CAD or PDM products for MSC, and so MSC is not a

competitor with UGS for the type of products Musti sold while at UGS.  The fact that Musti is not selling CAD or PDM products is not relevant to Musti's independent obligations under the non-solicitation clause, which is independent of the non-compete covenant.  Musti argues that several of the Raimonde factors apply to make the non-compete covenant unreasonable, but he does not specifically attack the non-solicitation clause.  Given Musti's long tenure with UGS and its predecessors and the goodwill that Musti no doubt helped cultivate on behalf of UGS, the Court concludes that the non-solicitation clause of the 2004 Agreement is reasonable.

However, the Court also concludes that the record simply does not establish as an undisputed fact that Musti has solicited any UGS customer to "terminate or diminish its relationship" with UGS, or that Musti has tried to persuade any UGS customer to do with MSC any business that the customer "conducts or could conduct" with UGS.  The fact that UGS has no evidence of any business lost due to Musti's departure weighs in favor of Musti but does not resolve the question, as the period of non-solicitation does not expire until January 2008.

The Court therefore denies summary judgment to both parties on the question of breach of the non-solicitation clause of the 2004 Agreement.

7.  <u>UGS' Tortious Interference Claims</u>.

Counts 2 and 3 of the Second Amended Complaint allege tortious interference with existing UGS contracts, and with prospective economic relationships.  UGS argues, in a footnote to its motion, that it is entitled to summary judgment on these claims.

To establish tortious interference with contracts, UGS must show (1) the existence of a UGS customer contract, (2) Musti's knowledge of the contract, (3) Musti's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages.  <u>Fred Siegel Co. v. Arter & Hadden</u>, 85 Ohio St.3d 171, Syllabus (1999).  The fourth element requires proof that Musti's interference was "improper."  <u>Id</u>. (citation omitted).  The Court also adopted the test of §767 of the Restatement of Torts, to determine "improper" conduct: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.  <u>Id</u>.

Assuming UGS has satisfied the first two elements of the tort, UGS has not come forward with any evidence that Musti has

-24-

lured any UGS customers away, or that he has intentionally encouraged a UGS customer to breach an existing relationship with UGS.  Indeed, the deposition testimony in the record is uniform in stating that UGS has not lost any business nor suffered any disruption in any customer relationship since Musti departed. Since UGS has not offered evidence of any lost business, it also has not produced any evidence of any damages it has sustained as a result of Musti's alleged tortious conduct.

The Court therefore grants summary judgment to Musti on the claims of tortious interference with contract, and tortious interference with prospective economic advantage.

5.  <u>Musti's Counterclaim</u>.

Musti seeks summary judgment on his counterclaim for payment of earned compensation, which is premised on two separate agreements.  One is a stock option plan (Doc. 45, Exhibit A), and the other is a sales incentive plan (Doc. 45, Exhibit B).

The stock option plan generally granted Musti certain UGS stock options.  The attachment to the plan states that Musti's interest in these options was vested at the time he left UGS. UGS relies on Section 5b, which states that notwithstanding vesting rules, Musti's option "will immediate terminate if the Optionee's employment is terminated by the Company for Cause." "Cause" is defined in Section 5(e) as a material breach of any agreement between UGS and Musti after notice and opportunity to

cure, or intentional destruction or theft of Company property or falsification of Company documents.

UGS did not terminate Musti's employment for cause.  In fact UGS wanted him to stay (likening his loss to the loss of Shaquille O'Neal to a basketball team).  Assuming that the "cause" definition applies to an employee's subsequent breach of a restrictive covenant in his employment agreement, the Court has concluded that neither party is entitled to summary judgment on the issue of non-solicitation.  If UGS is able to prove a "material" breach (a term undefined in the Plan), it may also be able to establish "cause" as defined in the Plan.  If Musti prevails on the non-solicitation issue, or in proving that any breach of his non-solicitation clause was de minimus or not "material," he will be entitled to recover.  The Court has concluded that Musti did not intentionally steal Company property, and that section of the Plan cannot form the basis for the denial of payment of his options.

The second agreement is a UGS Americas Sales Incentive Plan. The "Plan Year" is defined as January 1, 2005 through December 31, 2005.  UGS relies on Section 3.3, stating that UGS retains the right to change, modify or eliminate any part of the Plan at any time, with or without notice.  Section 3.7 states that the amount of any incentive award under the Plan "is to be determined by the sole discretion of UGS Leadership.  UGS Leadership has the

-26-

sole discretion, subject to local law, to determine the amount, if any, for which a Participant may be eligible under the Plan and may determine that the Participant is not eligible for any amount." Since any Plan payment is entirely discretionary, UGS argues Musti cannot challenge the denial of his incentive plan pay. UGS cites <u>Rogers v. Solid Waste Authority of Central Ohio</u>, 2005 U.S. Dist. LEXIS 12206 (S.D. Ohio, October 12, 2005, Frost, J.), which dealt with unpaid bonuses sought by a terminated employee. There, the court distinguished between a merit, or performance-based bonus, and a goal-sharing, or non-performance based bonus. The district court noted at least one Ohio case holding that an employee may be equitably entitled to collect a post-termination year-end bonus, if the services for the bonus year and on which the bonus is calculated have already been completed. See <u>McKelvey v. Spitzer Motor Center</u>, 46 Ohio App.3d 75, 77-78 (1988). In contrast, a pure performance-based bonus, based upon that employee's personal evaluation by his supervisor is entirely discretionary with the employer, and the ex-employee may not recover that payment.

Musti submits a "Compensation Statement" dated December 2005, reflecting "month to date" total earnings under this plan of $27,486.90. He argues that the <u>amount</u> of his incentive pay is not in dispute, as UGS had already determined that amount before he left. He claims he had already earned his payment by the end

-27-

of 2005, and that UGS does not have discretion under the Plan to deny him payments he had already earned and which were already credited to him.

The UGS Sales Incentive Plan is clearly based upon sales revenue, and in that way is more like a commission than an individual performance-based bonus.  The Court also notes that Section 3.2 states that if a participant's employment is terminated, he is eligible to receive incentive payments for which he may have otherwise been eligible in accordance with the Plan and applicable relative documents through the effective date of the termination.  This language suggests that termination is not a basis upon which UGS normally denies incentive payments. Moreover, several Ohio cases permit the Court to consider equitable factors when determining whether an employee is entitled to recover this sort of payment post-termination. Evidence at trial may well support Musti's claim under equitable considerations, and especially if the evidence establishes he has not breached any of his Agreements with UGS.  Therefore the Court denies summary judgment to both parties on Musti's counterclaim.

## CONCLUSION

The Court finds a disputed issue of material fact exists on whether or not Musti has violated the non-solicitation clause of his 2004 Agreement with UGS.  The Court grants summary judgment to Musti on the claim that he has violated the non-compete

-28-

covenant of the 2004 Agreement, and grants Musti summary judgment on the tortious interference claims. The Court denies summary judgment to both parties on Musti's counterclaim.

     SO ORDERED.

DATED: February 1, 2007       <u>s/Sandra S. Beckwith</u>
                           Sandra S. Beckwith, Chief Judge
                            United States District Court